IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

* * * * * * * * *

| | | |
|---|---|---|
| KANE COUNTY, UTAH, a Utah political subdivision, et al., | ) ) ) | Civil No. 2:05-CV-0941BSJ |
| Plaintiff, | ) ) | |
| vs. | ) ) | **MEMORANDUM OPINION & ORDER** |
| DIRK KEMPTHORNE, in his official capacity as Secretary of the Interior, et al., | ) ) ) ) | |
| Defendants, | ) ) | |
| NATIONAL TRUST FOR HISTORIC PRESERVATION, et al., | ) ) ) | |
| Intervenor-Defendants. | ) | |

```
┌─────────────────────────────────┐
│            FILED                │
│  CLERK, U.S. DISTRICT COURT     │
│   June 29, 2007 (3:34pm)        │
│      DISTRICT OF UTAH           │
└─────────────────────────────────┘
```

* * * * * * * * *

On January 22, 2007, the above-captioned proceeding came before this court for a hearing on pending motions.  Shawn T. Welch and Matthew L. Crockett appeared on behalf of the plaintiffs Kane and Garfield Counties, their Boards of Commissioners and the Kane County Water Conservancy District (the "Counties"); Thomas K. Snodgrass and Jared C. Bennett appeared on behalf of Dirk Kempthorne, the Secretary of the Interior,[1] the Interior Department, the Bureau of Land Management, Kathleen Clark, Gene Terland and David Hunsaker (the "Federal Defendants"); Edward B. Zukoski and J. McCrystie Adams appeared on behalf of the

---

[1] The plaintiffs' Complaint and Amended Complaint named Gale Norton as the defendant Secretary of the Interior.  Ms. Norton has since left office, and the court hereby substitutes her successor, Dirk Kempthorne, as a named defendant.  *See* Fed. R. Civ. P. 25(d)(1).

National Trust for Historic Preservation, the Sierra Club, the Wilderness Society and the

Southern Utah Wilderness Alliance (the "Intervenor-Defendants").

**BACKGROUND**

By Presidential Proclamation No. 6920, dated September 18, 1996 (the "Proclamation"),

President William J .Clinton established the Grand Staircase-Escalante National Monument,

encompassing more than 1.8 million acres of public lands located in Kane and Garfield Counties.

*See* Proc. No. 6920, 61 Fed. Reg. 50223-50227, 110 Stat. 4561 (1996).[2]  By its own terms, "[t]he

establishment of this monument is subject to valid existing rights."  Proc. No. 6920, 61 Fed. Reg.

50225, 110 Stat 4564.

The Proclamation required the formulation of a management plan for the Monument:

> The Secretary of the Interior shall manage the monument through the Bureau of
> Land Management, pursuant to applicable legal authorities, to implement the
> purposes of this proclamation.  The Secretary of the Interior shall prepare, within
> 3 years of this date, a management plan for this monument, and shall promulgate
> such regulations for its management as he deems appropriate.  This proclamation
> does not reserve water as a matter of Federal law.  I direct the Secretary to address
> in the management plan the extent to which water is necessary for the proper care
> and management of the objects of this monument and the extent to which further
> action may be necessary pursuant to Federal or State law to assure the availability
> of water.

Proc. No. 6920, 61 Fed. Reg. 50225, 110 Stat. 4564.

In November of 1998, the Bureau of Land Management (BLM) released a draft

management plan and draft environmental impact statement for the Monument, followed by a

---

[2]The Proclamation was made pursuant to the authority granted by Section 2 of the Antiquities Act of 1906, Act
of June 8, 1906, ch. 3060, 34 Stat. 225 (1906), *codified at* 16 U.S.C.A.§ 431 (2000).  Congress subsequently ratified an
exchange of Utah state school trust lands within the Grand Staircase-Escalante National Monument for federal lands
located outside of the Monument's boundaries.  *See* Utah Schools and Lands Exchange Act of 1998, Pub. L. No. 105-
335, 112 Stat. 3139 (1998).  Congress also adjusted the boundaries of the Monument, excluding certain named townsites
and other parcels, and adding the East Clark Bench to the Monument.  *See* Act of Nov. 6, 1998, Pub. L. No. 105-355, title
II, 112 Stat. 3247, 3252-53 (1998); Act of March 6, 2000, title III, § 307, 114 Stat. 33 (2000) (making corrections).

four-month public comment period.  The BLM then released a Proposed Management Plan,

notice of which was published in the *Federal Register*.  *See* 64 Fed. Reg. 41129-30 (July 29,

1999).  Following another comment period, the Secretary of the Interior signed an Approved

Management Plan and Record of Decision on November 15, 1999 (the "Management Plan"),

which went into effect on February 29, 2000, the date that notice of the release of the

Management Plan was published in the *Federal Register*.  *See* 65 Fed. Reg. 10819 (February 29,

2000).[3]

The Management Plan undertakes to "protect the myriad historic and scientific resources

in the Monument" by managing the Monument "according to two basic principles."

> First and foremost, the Monument will remain protected in its primitive, frontier
> state.  The BLM will safeguard the remote and undeveloped character of the
> Monument, which is essential to the protection of the scientific and historic
> resources.  Second, the Monument will provide opportunities for the study of
> scientific and historic resources. . . .

(*Grand Staircase-Escalante National Monument Approved Management Plan/Record of

Decision*, "Introduction" at *iv*.)  The Management Plan adopts a strategy that limits visitor

development "to minor facilities such as interpretive kiosks and pullouts, located in small areas

on the periphery of the Monument," and limits motorized access to Monument lands:

> Motorized access will also be limited. The Plan designates a road network, which
> will be left largely in its presently unimproved condition.  The Plan also
> eliminates cross-country motorized travel.  In doing so, the BLM will ensure that
> the remote, undeveloped nature of this landscape remains for generations to come.

(*Id.*)

"The Plan also addresses valid rights which were recognized and protected in the

---

[3]Copies of the Approved Management Plan and Record of Decision are available from the BLM and online at
http://www.ut.blm.gov/monument/planning-monument-plan.php in .pdf file format.

Proclamation," (*id.* at *v*), including highway rights-of-way established pursuant to R.S. 2477;[4]

indeed, the text of the Management Plan was revised to "emphasize that nothing in the Plan

extinguishes any valid existing rights-of-way in Grand Staircase-Escalante National Monument."

(*Id.*, "Record of Decision," at *ix*.)  In particular, "Nothing in this Plan alters in any way any legal

rights the Counties of Garfield and Kane or the State of Utah has to assert and protect R.S. 2477

rights, and to challenge in Federal court, or any other appropriate venue, any BLM road closures

that they believe are inconsistent with their rights."  (*Id.*)

> Footnote 1 to Chapter 2 of the Plan elaborates on this point:

> Some government entities may have a valid existing right to an access route under
> Revised Statutes (R.S.) 2477, Act of June 26, 1866, ch. 262, § 8, 14 Stat. 251
> [codified as amended at 43 U.S.C. § 932 until repealed in1976 by the Federal
> Land Policy and Management Act of 1976 (FLPMA), Public Law 94-579, Section
> 706(a), Stat. 2744, 2793 (1976)], which granted "[the right-of-way for the
> construction of highways over public lands, not reserved for public uses.]" As
> described in the United States Department of Interior, Report to Congress on R.S.
> 2477 (June 1993), claims of rights-of-ways under R.S. 2477 are contentious and
> complicated issues, which have resulted in extensive litigation. See e,g, Sierra
> Club v. Hodel, 848 F.2d 1068 (10th Cir. 1988); Southern Utah Wilderness
> Alliance v. Bureau of Land Management, Consolidated Case No. 2:96-CV-836-S
> (D. Utah, filed Oct. 3, 1996, pending). It is unknown whether any R.S. 2477
> claims would be asserted in the Monument which are inconsistent with the
> transportation decisions made in the Approved Plan or whether any of those R.S.
> 2477 claims would be determined to be valid. To the extent inconsistent claims
> are made, the validity of those claims would have to be determined. If claims are
> determined to be valid R.S. 2477 highways, the Approved Plan will respect those
> as valid existing rights. Otherwise, the transportation system described in the
> Approved Plan will be the one administered in the Monument. Nothing in this

---

[4]R.S. 2477 is formally known as the Act of July 26, 1866, ch. 262, § 8, 14 Stat. 251, 253, Revised Statutes §
2477, *formerly codified at* 43 U.S.C. § 932 (1970) (repealed).  It provided as follows, in its entirety: "The right of way for
the construction of highways over the public lands, not reserved for public uses, is granted."  Section 706(a) of the
Federal Land Policy and Management Act of 1976 (FLPMA), 90 Stat. 2793 (1976), repealed section 8 of the Act of July
26, 1866, 43 U.S.C. § 932 (1970), R.S. 2477, effective October 21, 1976.  FLPMA repealed R.S. 2477 "and its
open-ended grant of rights-of-way over public lands while explicitly protecting R.S. 2477 rights-of-way in existence on
the date of the FLPMA's passage."  *Sierra Club v. Hodel*, 848 F.2d 1068, 1078 (10th Cir. 1988), *overruled on other
grounds*, *Village of Los Ranchos de Albuquerque v. Marsh*, 956 F.2d 970, 973 (10th Cir. 1992).

> Plan extinguishes any valid existing right-of-way in the Grand Staircase Escalante
> National Monument. Nothing in this Plan alters in any way any legal rights the
> Counties of Garfield and Kane or the State of Utah has to assert and protect R.S.
> 2477 rights, and to challenge in Federal court or other appropriate venue, any
> BLM road closures that they believe are inconsistent with their rights.

(*Id.*, ch. 2, at 46 n.1.)

Neither the Management Plan nor the Record of Decision undertook to identify all of the

Counties' unresolved claims of R.S. 2477 rights-of-way within the Monument boundaries, or to

adjudicate the validity of any particular claim.  Instead, the Plan designates a travel route system

for the Monument that is delineated on Map 2 of the Plan, and provides that "[a]ny route not

shown on Map 2 is considered closed upon approval of the Plan, subject to valid existing rights."

(*Id.* ch. 2, at 46.)  Map 2 reflects previously identified R.S. 2477 rights-of-way, including the

Burr Trail Road, the Hole-in-the-Rock Road, and the Skutumpah Road, and indicates them to be

"open" to travel, subject to restrictions on the use of off-highway vehicles. As quoted above, the

Plan leaves the determination of the validity of the Counties' unresolved R.S. 2477 claims to a

"Federal court or other appropriate venue."

On November 14, 2005, the Counties commenced the above-captioned action, seeking

declaratory, injunctive and mandamus relief invalidating the Management Plan's travel route

system as being arbitrary, capricious and contrary to law, and forbidding the BLM to implement

any road travel restrictions within the Monument before determining whether such restrictions

would impair any valid existing R.S. 2477 right-of-way claimed by the Counties or the Counties'

right to maintain class "B" and "D" roads within their respective boundaries.[5]  The Counties'

---

[5]The Counties' pleadings do not seek the adjudication in this forum of any particular R.S. 2477 claim within the
Monument boundaries.  Like the Management Plan, the Counties' pleadings defer those determinations to another day.

Complaint (dkt. no. 1), and their First Amended Complaint, filed February 27, 2006 (dkt. no. 9), also ask this court to invalidate any Management Plan provision that would restrict Kane County Water Conservancy District's diversion of water from within the Monument in the exercise of its existing or potential state law water rights.

On May 5, 2006, the Federal Defendants moved to dismiss the Counties' complaint, arguing that the Counties lack standing to sue because they fail to allege a concrete "injury-in-fact" resulting from the BLM's adoption of the Management Plan, and they fail to state a claim upon which relief may be granted because federal law does not require the BLM to identify and determine all existing R.S. 2477 rights-of-way when preparing a management plan for the Monument.  They also assert that the Counties' claims are unripe and are barred by the doctrine of sovereign immunity.  (*See* Federal Defendants' Motion to Dismiss, filed May 5, 2006 (dkt. no. 17).)

On May 26, 2006, the Intervenor-Defendants filed a motion for judgment on the pleadings, asserting "substantially the same reasons" as the Federal Defendants' motion. (Defendant-Intervenors Southern Utah Wilderness Alliance, et al.'s Motion for Judgment on the Pleadings, filed May 26, 2006 (dkt. no. 23), at 1.)  "First and foremost," the Intervenor-Defendants contend, "the United States may not be sued based upon bare allegations of title, such as made by the Counties here, except under the Quiet Title Act, 28 U.S.C. § 2409a, which the Counties failed to invoke."  (*Id.* at 2; *see also* Memorandum in Support of Defendant-Intervenors Southern Utah Wilderness Alliance, et al.'s Motion for Judgment on the Pleadings, filed May 26, 2006 (dkt. nos. 21/22) ("SUWA Mem.").)

**STANDING TO SUE**

**The Counties' Unresolved R.S. 2477 Right-of-Way Claims**

At the core of the Counties' claims is a question of sequence.

In their view, management of road travel within the Monument should be addressed by the BLM only after all of the Counties' unresolved R.S. 2477 right-of-way claims have been determined by the agency.

The Counties allege that the current road travel restrictions imposed by the Management Plan's travel route system are arbitrary, capricious and not in accordance with law,[6] particularly when considered in light of the BLM's administrative record.  In defining that record,[7] the

---

[6]In this action, the Counties seek judicial review of the Management Plan pursuant to the Administrative Procedure Act, 5 U.S.C.A. §§ 701 *et seq.* (2007).

Under the APA, a reviewing court may set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); Silverton Snowmobile Club v. U.S. Forest Serv., 433 F.3d 772, 779-80 (10th Cir.2006). "[T]he essential function of judicial review [of agency action] is a determination of (1) whether the agency acted within the scope of its authority, (2) whether the agency complied with prescribed procedures, and (3) whether the action is otherwise arbitrary, capricious or an abuse of discretion." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir.1994).

*Utah Shared Access Alliance v. Carpenter*, 463 F.3d 1125, 1134 (10th Cir. 2006), *cert. denied*, 127 S. Ct. 2100 (2007). There appears to be a consensus among the parties that the Management Plan constitutes a "final agency action" within the meaning of the APA.  (*See* Memorandum of Points and Authorities Regarding Whether the GSENM Plan is Final Agency Action, filed February 12, 2007 (dkt. no. 59); Supplemental Memorandum on Legal Issue discussed at Hearing on Motion to Dismiss and Motion for Judgment on the Pleadings, filed February 1, 2007 (dkt. no. 56); *cf.* Defendant-Intervenors Southern Utah Wilderness Alliance, et al.'s Supplemental Memorandum in Support of Motion for Judgment on the Pleadings, filed February 1, 2007 (dkt. no. 57).)

[7]As the court of appeals has explained:

A district court reviews an agency action to determine if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  A review under this standard is generally based on the full administrative record that was before all decision makers, including in this case the Deciding Officer and the Reviewing Officers, at the time of the decision. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971). The district court must have before it the "whole record" on which the agency acted. *Appalachian Power Co. v. EPA*, 477 F.2d 495, 507 (4th Cir.1973). *See also Overton Park*, 401 U.S. at 419, 91 S.Ct. at 825. "[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138,

(continued...)

Counties look beyond the public comment periods on the draft management plan and proposed

management plan in 1998 and 1999, pointing instead to prior agency activity which purportedly

undertook to make administrative determinations concerning the Counties' R.S. 2477 right-of-

way claims affecting lands now part of the Monument.

According to the Counties, the BLM's Richfield field office began such an effort in 1991

as part of an inventory of public roads that was taken while the agency was formulating a

transportation plan for the BLM's Henry Mountain Resource Area.  (*See* Combined Opposition

to the Federal Defendants' Motion to Dismiss and the Defendant-Intervenors' Motion for

Judgment on the Pleadings, filed June 16, 2006 (dkt. no. 30) ("Counties' Mem."), at 5 ¶9.)  A

similar inventory of public roads purportedly was begun by the BLM's Escalante and Kanab field

offices in 1993.  (*Id.* at 5 ¶ 10.)  The Counties aver that these administrative determinations

would have validated 75 to 85 percent of the Counties' R.S. 2477 right-of-way claims—many

"for roads crossing lands that are now within the Monument"—but the BLM ceased processing

the R.S. 2477 determinations in 1994 or 1995, and none were finalized.  (*Id.* at 5 ¶¶ 11-12.)

Nor were they incorporated into the travel route system adopted as part of the

Monument's Management Plan in 1999.  "During promulgation of the Plan," the Counties assert,

"the BLM planners did not resume the administrative determinations for Garfield and Kane

County roads."  (*Id.* at 6 ¶ 16.)  In fact, the 1999 Record of Decision makes no reference to any

---

[7](...continued)
142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973).  The complete administrative record consists of all
documents and materials directly or indirectly considered by the agency.  *Lloyd v. Illinois Regional
Transp. Authority*, 548 F.Supp. 575, 590 (N.D.Ill.1982); *Tenneco Oil Co. v. Department of Energy*,
475 F.Supp. 299, 317 (D.Del.1979).

*Bar MK Ranches v. Yuetter*, 994 F.2d 735, 739 (10th Cir. 1993).  Whether the BLM's prior road inventory work in 1991
and 1993 was part of the "record" relied upon by the BLM in formulating the 1999 Management Plan remains unclear.

such administrative determinations at all—"[d]espite the Counties' requests that the BLM

planners address the existence of the Counties' roads . . . ."  (*Id.* at 6 ¶ 17.)[8]

   Having provisionally found that 75-85 percent of the Counties' R.S. 2477 claims were

valid during its prior public road inventory process—as the Counties now insist the BLM

did—the Counties find it somewhat disingenuous for the BLM's Management Plan to recite that

"[i]t is unknown whether any R.S. 2477 claims would be asserted in the Monument which are

inconsistent with the transportation decisions made in the Approved Plan or whether any of those

R.S. 2477 claims would be determined to be valid."

The Counties submit that "the Federal Defendants *have not denied* the existence of any of

these rights (stating that it is not known whether they exist), rather they have merely refused to

consider them" in formulating the Management Plan.  (*Id.* at 13 (emphasis in original).)  The

Counties assert that "[t]he Plan's failure to identify and protect these valid existing rights leaves

Kane and Garfield Counties at risk of being sued (again) if they take action to manage, maintain

or use their roads that are restricted or not shown on Map 2" of the Management Plan.  (*Id.*)  Or,

as the Management Plan itself suggests, the Plan burdens the Counties with the need to seek

validation of their unresolved R.S. 2477 right-of-way claims in the courts.

The Counties insist that the BLM must do more than pay lip service to existing rights

within the Monument, and they ask, "Would it be arbitrary and capricious for the agency to

ignore what it already knows . . . and adopt a plan in willful ignorance of what it already knew"

about the Counties' unresolved R.S. 2477 claims?  (Transcript of Hearing, dated January 22,

---

[8]The Counties aver that "Map 2 of the Plan fails to show many historic Kane and Garfield County roads."
(Counties' Mem. at 10 ¶ 36.)

2007, at 44:3-6 (Mr. Welch).)

> [A]ll we are asking for on behalf of the plaintiffs is the chance to show the Court the record, and we believe there are items that were within the possession and control of the BLM that were not included in the record that materially relate to the issues addressed in the challenged portions of the Plan and present to the Court what facts did the agency have before it when it made its decision to adopt the transportation section and water management sections of the Monument Plan.

(*Id.* at 18:11-20 (Mr. Welch).)

The Counties seek declaratory relief establishing that the transportation and access sections of the Management Plan arbitrarily, capriciously and unlawfully impair their interests in "the continuing use, access, possession, maintenance and management of their rights-of-way" within the Monument.  (First Amended Complaint for Mandamus, Delaratory and Injunctive Relief, filed February 27, 2006 (dkt. no. 9) ("First Amd. Cmplt."), at 24 ¶¶ 80-83; *id.* at 26 ¶ 1.) They seek to enjoin enforcement of the transportation and access sections of the Plan, including Map 2, (*id.* at 25 ¶ 88, 27 ¶ 3), as well as the implementation of "any road management decisions within the Monument, including use restrictions, closures and reclamation activities, unless and until Defendants determine that such actions are lawfully subject to valid existing rights . . . ." (*Id.* at 27 ¶4.)  They also seek "an order in the nature of mandamus" directing the Secretary and others "to first determine Plaintiffs' valid existing rights before asserting or taking any action" to enforce or implement the transportation and access sections of the Plan, and to remove any physical access barriers "from any right-of-way or road within the Monument" that has been placed pursuant to the Plan.  (*Id.* at 27-28 ¶ 5.)

**Restriction of Off-Highway Vehicles**

Moreover, the Counties submit, the Management Plan attempts to regulate the use of off-

highway vehicles on roads within the Monument that have already been acknowledged as R.S. 2477 rights-of-way and are designated as "open" on Map 2 of the Plan, including the Burr Trail Road, the Hole-in-the-Rock Road, and the Skutumpah Road.  (*Id.* at 7-8 ¶¶ 19-25.)  The Counties alleged that they would permit the use of off-highway vehicles on those roads—a use the Management Plan forbids.  (*Id.*)  They seek injunctive relief against enforcement of the Plan's OHV use restrictions.  (*Id.* at 27 ¶¶ 3-4.)

### Coordination with Local Governments

Besides not making the requisite R.S. 2477 right-of-way determinations, the Counties allege that the BLM improperly excluded County officials and the consideration of County plans from its planning process in 1998-1999, contrary to the mandate of the Federal Land Policy and Management Act (FLPMA) that "[l]and use plans of the Secretary . . . shall be consistent with State and local plans to the maximum extent he finds consistent with Federal law and the purposes of this Act," requiring the Secretary to develop land use plans considering the present uses of the lands and in coordination with local government.   43 U.S.C.A. § 1712(c)(9); *see* 43 U.S.C.A. §§ 1701(a)(2) (declaring that "the national interest will be best realized if the public lands and their resources are periodically and systematically inventoried and their present and future use is projected through a land use planning process coordinated with other Federal and State planning efforts"); 43 U.S.C.A. 1712(b)-(c).  The Counties allege that they "attempted meaningful participation in the development of the Plan, but their efforts were rebuffed," that their "comments and protests were ignored," and that the Management Plan "utterly fails to address Plaintiffs' local plans."  (First Amd. Cmplt. at 19-20 ¶¶ 57-62.)

Section 202(c)(9) of FLPMA reads:

In the development and revision of land use plans, the Secretary shall—

* * * *

(9) to the extent consistent with the laws governing the administration of the public lands, coordinate the land use inventory, planning, and management activities of or for such lands with the land use planning and management programs of other Federal departments and agencies and of the States and local governments within which the lands are located, including, but not limited to, the statewide outdoor recreation plans developed under the Act of September 3, 1964 (78 Stat. 897), as amended [16 U.S.C. 460l–4 et seq.], and of or for Indian tribes by, among other things, considering the policies of approved State and tribal land resource management programs.  In implementing this directive, the Secretary shall, to the extent he finds practical, keep apprised of State, local, and tribal land use plans; assure that consideration is given to those State, local, and tribal plans that are germane in the development of land use plans for public lands; assist in resolving, to the extent practical, inconsistencies between Federal and non-Federal Government plans, and shall provide for meaningful public involvement of State and local government officials, both elected and appointed, in the development of land use programs, land use regulations, and land use decisions for public lands, including early public notice of proposed decisions which may have a significant impact on non-Federal lands. Such officials in each State are authorized to furnish advice to the Secretary with respect to the development and revision of land use plans, land use guidelines, land use rules, and land use regulations for the public lands within such State and with respect to such other land use matters as may be referred to them by him. Land use plans of the Secretary under this section shall be consistent with State and local plans to the maximum extent he finds consistent with Federal law and the purposes of this Act.

43 U.S.C.A. § 1712(c)(9).

The Counties assert that the BLM's coordination with local governments pursuant to FLPMA § 202(c)(9) during the formulation of the Management Plan in 1998-1999 should be measured by "the standard, 'to the maximum extent practicable,'" a standard that "is sufficiently precise to permit a federal court to evaluate" the Federal Defendants' coordination efforts and assess whether they have acted in a manner "consistent with congressional intent." *Sierra Club v. Edwards*, 1983 U.S. Dist. LEXIS 17625, at *12 (D.D.C. 1983).[9]  Measured by that standard,

_____

[9]The Counties cited this unpublished decision in their Notice of Supplemental Authority, filed June 25, 2007

(continued...)

-12-

the Counties argue, the BLM's 1998-1999 planning process fails to comport with congressional

intent as embodied in FLPMA §§ 202(c)(9) and 202(c)(5) ("In the development and revision of

land use plans, the Secretary shall— * * * (5) consider present and potential uses of the public

lands;").  The Counties contend that "[t]he procedural and substantive defects in the development

and implementation of the Transportation and Access section of the Plan deprive it of any

legitimate authority or effect,"  (First Amd. Cmplt. at 25 ¶ 86), and they ask that enforcement of

the transportation and access sections of the Plan, including Map 2, LAND-4 and Water, be

enjoined.  (*Id.* at 25 ¶ 88.)

### The Counties' Standing to Sue and "Injury-in-Fact"

As the court of appeals has explained:

To satisfy the standing requirement of Article III, Plaintiffs must demonstrate the following:

> (1) that the plaintiff[s] have suffered an "injury in fact"—an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that there [is] a causal connection between the injury and the conduct complained of-the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) that it [is] likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Bennett*, 520 U.S. at ----, 117 S.Ct. at 1163 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 2136-37, 119 L.Ed.2d 351 (1992));

*State of Utah v. Babbitt*, 137 F.3d 1193, 1202 (10th Cir. 1998) (quoting *Bennett v. Spear*,

520 U.S. 154, 167 (1997)).

---

[9](...continued)
(dkt. no. 62).

-13-

The Counties insist that they have alleged the requisite "injury-in-fact" to their legally cognizable interests flowing from the Federal Defendants' failure "to identify existing rights and to adopt the Plan subject to those rights." (*Id.* at 16.)  In particular, county officials complain that the Plan's travel route system restricts use of several acknowledged R.S. 2477 highways by off-highway vehicles, and omits several county roads from the travel route map altogether, indicating that such roads are now deemed to be closed.  They also assert that the BLM has been slow to respond to the Counties' requests to conduct road maintenance activities within the Monument.[10] According to the Counties, the BLM's implementation of the Management Plan without first deciding the R.S. 2477 issues "constitute[s] a present and continuing impairment of Plaintiffs' rights" to regulate and maintain public roads within their respective jurisdictions.  (*Id.* at 15.)

The Counties also insist that their claims are ripe for adjudication.  (*Id.* at 16 (citing *Wyoming Outdoor Council v. United States Forest Service*, 165 F.3d 43, 51 (D.C. Cir. 1999) (a party injured by agency failure to meet a procedural requirement may complain at the time the failure takes place)).)

### "Injury-in-Fact" and the Counties' Unresolved R.S. 2477 Claims

The Counties' argument concerning sequence, *viz.*, that the BLM failed "to follow proper procedure to identify existing rights and to adopt the Plan subject to those rights," suggests that the BLM has an established procedure for determining R.S. 2477 right-of-way claims, and in turn, that the BLM has the primary jurisdictional authority to determine the validity of R.S. 2477 claims in a fashion that implicates procedural due process concerns.  Indeed, the Counties assert

---

[10](*See* Declaration of Brian B. Bremner, filed June 16, 2006 (dkt. no. 31), at 9-11 ¶¶ 32-38; Declaration of Louis Pratt, Jr., filed June 16, 2006 (dkt. no. 32), at 5-8 ¶¶ 27-34.)

that the agency has a *duty* to make such determinations as an integral part of its own agency planning process—a ministerial duty enforceable by R.S. 2477 claimants through a petition for judicial relief in the nature of a writ of mandamus.

In *Southern Utah Wilderness Alliance v. Bureau of Land Management*, 425 F.3d 735 (10th Cir. 2005), the court of appeals examined the BLM's authority to determine R.S. 2477 right-of-way claims, and did so at some length.  In that case, Kane County and Garfield County argued that the BLM's administrative determinations of several of the Counties' R.S. 2477 right-of-way claims were invalid because the agency had no formal procedure for making administrative R.S. 2477 determinations and could not exercise primary jurisdiction over such claims:

> In its 1993 Report to Congress on R.S. 2477, the Department of the Interior states: "No formal process for either asserting or recognizing R.S. 2477 rights-of-way currently is provided in law, regulations, or DOI policy."  DOI 1993 Report to Congress at 25 (recognizing that there are no formal procedures for determining the validity of R.S. 2477 claims).  That circumstance remains.  In the absence of guiding rules, the BLM determinations were improper and the district court's reliance on the determinations was error.  *See State of Utah v. Andrus*, 486 F. Supp. 995, 1009 n. 19 (D. Utah 1979) (finding that primary jurisdiction does not apply where there is no regulatory scheme beyond the provisions of FLPMA and observing the need for "an administrative mechanism through which primary jurisdiction could be exercised").

(Substitute Opening Brief of Appellants Kane and Garfield Counties, filed July 2, 2004, in *Southern Utah Wilderness Alliance v. Bureau of Land Management*, Case No. 04-4073, at 20.) The Counties noted that the BLM had curtailed the making of such determinations for its own internal purposes:

> Historically, BLM regularly recognized R.S. 2477 rights-of-way for its own internal purposes. U.S. Dept. of the Interior, Report to Congress on R.S. 2477 (June 1993) at 25.  That practice ended with the 1993 instruction of the Secretary

of the Interior to BLM "to defer any processing of R.S. 2477 assertions except in cases where there is a demonstrated, compelling, and immediate need to make such determinations."

(Reply Brief of Appellants Kane and Garfield Counties, filed Sept. 17, 2004, in *Southern Utah Wilderness Alliance v. Bureau of Land Management*, Case No. 04-4073, at 6 (footnote omitted) (quoting Interim Departmental Policy on Revised Statute 2477 2 (Jan. 22, 1997)).)  The Counties also noted that "[i]n 1992, the Department of the Interior proposed new substantive standards as well as a process for recognizing rights-of-way.  *See* 59 Fed. Reg. 39224-25, (1994). Congress not only declined to authorize those standards and procedures, but as BLM notes, prohibited their adoption."  (*Id.* at 9.)[11]

Based upon its review of the statutory framework and long-standing historical agency practice, the court of appeals agreed with the Counties that the BLM does *not* have primary jurisdiction to determine the validity of R.S. 2477 right-of-way claims:

---

[11]As recounted by the court of appeals:

In 1994, eighteen years after R.S. 2477 had been repealed, the BLM changed course and proposed comprehensive regulations governing R.S. 2477 rights of way.  *See* 59 Fed.Reg. 39216, 39219-27 (1994). These rules proposed, for the first time, an administrative procedure by which the BLM would adjudicate the validity of R.S. 2477 claims.  Congress responded with an appropriations provision prohibiting the Department of the Interior from issuing final rules governing R.S. 2477:

No final rule or regulation of any agency of the Federal Government pertaining to the recognition, management, or validity of a right-of-way pursuant to Revised Statute 2477 (43 U.S.C. [§ ] 932) shall take effect unless expressly authorized by an Act of Congress subsequent to the date of enactment of this Act [Sept. 30, 1996].

U.S. Department of the Interior and Related Agencies' Appropriations Act, 1997, § 108, enacted by the Omnibus Consolidated Appropriations Act, 1997, Pub.L. No. 104-208, 110 Stat. 3009 (1996).

*SUWA*, 425 F.3d at 756 (footnote omitted).  The Counties argue that this 1996 enactment "absolutely and directly prohibits the Federal Defendants from adopting any final rule or regulation pertaining to the management of R.S. 2477 rights-of-way.  The Federal Defendants' authority to manage the public lands ends at the edge of such rights-of-way." (Counties' Mem. At 18.)  This court has not been persuaded by this reading of the 1996 legislation.  *See, e.g., United States v. Garfield County*, 122 F. Supp. 2d 1201, 1235-41 (D. Utah 2000). Nor has the court of appeals.  *See, e.g., SUWA*, 425 F.3d at 745-49.

-16-

In sum, nothing in the terms of R.S. 2477 gives the BLM authority to make binding determinations on the validity of the rights of way granted thereunder, and we decline to infer such authority from silence when the statute creates no executive role for the BLM. This decision is reinforced by the long history of practice under the statute, during which the BLM has consistently disclaimed authority to make binding decisions on R.S. 2477 rights of way. Indeed, there have been 139 years of practice under the statute—110 years while the statute was in force, and 29 years since its repeal—and the BLM has not pointed to a single case in which a court has deferred to a binding determination by the BLM on an R.S. 2477 right of way. We conclude that the BLM lacks primary jurisdiction. . . .

*SUWA*, 425 F.3d at 757. At the same time, the court of appeals acknowledged the BLM's

authority to make non-binding R.S. 2477 right-of-way determinations for its own internal

purposes:

> This does not mean that the BLM is forbidden from determining the validity of R.S. 2477 rights of way for its own purposes. The BLM has always had this authority. It exercises this authority in what it calls "administrative determinations." In its 1993 Report to Congress, the Department of the Interior explained that the BLM had developed "procedures for administratively recognizing and . . . record[ing] this information on the land status records." 1993 D.O.I. Report to Congress, at 25. These procedures "are not intended to be binding, or a final agency action." *Id.* Rather, "they are recognitions of 'claims' and are useful only for limited purposes," namely, for the agency's internal "land-use planning purposes." *Id.* at 25-26. . . .

*Id.* (footnote omitted).

In this case, the Management Plan plainly reflects the view asserted by the Counties and

adopted by the Tenth Circuit in *SUWA*: that the final, binding determination of the Counties' R.S.

2477 right-of-way claims is a matter for the courts, not the BLM.

The defendants point out that nothing in FLPMA imposes an affirmative legal duty on the

BLM to make administrative determinations of all unresolved R.S. 2477 right-of-way claims as

part of the planning process, or otherwise. Nor does any regulation promulgated by the Interior

Department. The Intervenor-Defendants argue that "[b]ecause no statute or regulation imposes

such a duty — and because a court may not impose an R.S. 2477-investigation duty of its own

creation — the Counties' claim" must fail.  SUWA Mem. At 3 (citing *Yankee Nuclear Power*

*Corp. v. Natural Resources Defense Council*, 435 U.S. 519, 524 (1978)).[12]

The Counties respond that such a duty nevertheless "is well established," citing to several

opinions of the Interior Board of Land Appeals and a footnote to the Tenth Circuit's *SUWA*

opinion.  (Counties' Mem. at 19 (citing *Charles W. Nolen*, 168 IBLA 352, 259, 2006 WL

1644644 (2006); *Courtney Ayers*, 122 IBLA 275, 278 (1992); *Leo Titus, Sr.*, 89 IBLA 323, 338

(1985); *Homer D. Meeds*, 26 IBLA 281, 83 I.D. 315 (1976);  *SUWA*, 425 F.3d at 757 n.12.)   Yet

the IBLA opinions cited by the Counties involve the administrative determination of R.S. 2477

claims in the context of trespass proceedings or road closure protests, not *sua sponte*

determinations as part of the agency's own planning process.

*Charles W. Nolen* arose from a private protest of the intended closure of roads located on

public lands near Roswell, New Mexico under a BLM Route Designation Plan.  The IBLA

explained that it has

> held that the need to consider whether lands are within the purview of R. S. 2477
> arises when BLM has an "administrative concern" that requires inquiry into the
> status of a claimed R. S. 2477 right-of-way.  *Southern Utah Wilderness Alliance*,
> 111 IBLA 207, 213-214 (1989).  Review is appropriate "in cases where a
> determination would be helpful in the administration of the public lands." *Leo
> Titus, Sr.*, 89 IBLA 323, 338, 92 I.D. 578, 587 (1985).  Such review is necessary,
> we have expressly held, when (as in the instant case) it is asserted that BLM has
> closed an R. S. 2477 right-of-way. *See Homer D. Meeds*, 26 IBLA 281, 83 I.D.

---

[12]The sequence now urged by the Counties would have raised practical concerns as well.  The 1996 Presidential Proclamation mandated that the Secretary of the Interior "shall prepare, within 3 years of this date, a management plan for this monument, and shall promulgate such regulations for its management as he deems appropriate."  Proc. No. 6920, 61 Fed. Reg. 50225, 110 Stat. 4564.  If the BLM had proceeded as the Counties now suggest—adjudicating all title issues arising from unresolved claims of R.S. 2477 or other rights-of-way before formulating the management plan for the Monument—it seems doubtful that the BLM could have met the three-year planning deadline explicitly set by the President.

315 (1976); *accord, Bear River Development Corp.*, 157 IBLA 37, 59 (2002) (AJ Burski, concurring). Appellant protested that BLM was closing roads that "have met the criteria and the recognition of the different agencies as public [R. S. 2477] road easements." (AR 5-2.)  BLM accordingly undertook to review whether the roads closed by its RDP were within the purview of R. S. 2477, concluding in its EA that they were not. . . .

*Homer D. Meeds* similarly arose in the context of an individual protest to a BLM road closure; the IBLA concluded that BLM determination of the possible existence of such a right-of-way was necessary where a road closure proposed by BLM was protested because the road was claimed to be a public road established under R.S. 2477, agreeing that this was a special circumstance of "administrative concern" which could justify the effort and difficulty necessarily involved in making a determination normally reserved to the state courts because "it is appropriate that the Bureau review the propriety of its actions *for its own purpose* . . . ."  *Id.* at 26 IBLA 298-99, 83 I.D. at 323 (emphasis added).[13]

In *Courtney Ayers*, the appellant raised his R.S. 2477 claim as a defense to a civil trespass penalty:

> Although the Department ordinarily will not attempt to adjudicate whether an R.S. 2477 right-of-way has been created, because such a decision involves questions of state law, if the question whether such a right-of-way exists cannot reasonably be avoided in the ordinary course of administration of the public lands it must nonetheless be dealt with. See *Leo Titus Sr.*, 89 IBLA 323, 335-36, 92 I.D. 578, 586 (1985); *Nick Dire*, 55 IBLA 151 (1981).  In defense against the assessment of trespass penalties in this case, appellant has squarely raised the issue whether this 1,000-foot long road junction is an R.S. 2477 right-of-way.

---

[13]It also appears significant that *Meeds* involved the question of whether an R.S. 2477 right-of-way existed on Oregon and California (O&C) revested lands.  Generally, rights under R.S. 2477 were acquired without any action on the part of the Federal Government, *see United States v. 9,947.71 Acres of Land*, 220 F. Supp. 328 (D. Nev. 1963), but in 1957 the Department had adopted regulations (formerly codified at 43 CFR 2822.1-2 (1976)) which required the filing of an application as a precondition to obtaining an R.S. 2477 right-of-way over O&C revested lands.  *Meeds* simply held that BLM should examine the question of whether an R.S. 2477 already existed (which would make BLM's closure of the road erroneous) and, if not, whether it should accept an application to allow the initiation of such rights under R.S. 2477.

Of course, *Meeds* was decided before R.S. 2477 was repealed by FLPMA.

> Because BLM rejected his contention that the road approach he built was a
> reconstruction of an existing public highway when the trespass penalty was
> assessed, we will examine the evidence he has offered to show that this road was a
> highway before 1976 when R.S. 2477 was repealed by FLPMA. . . .

122 IBLA at 278.  The IBLA affirmed the penalty assessment, concluding that the appellant had

not shown historical activity that "amounts to the creation of a public highway under Montana

law."  *Id.* at 281.

In each case cited by the Counties, then, the BLM was called upon to make an

administrative determination of an R.S. 2477 claim in the particularized context of an individual

dispute over a specific road.  The IBLA has noted that doing so represents an exception to the

Department's general policy of giving deference to the courts in making such determinations.

*See, e.g.*, *Sierra Club*, 111 IBLA 122, 128-29 (1989) ("The Department has generally held that

the proper forum for adjudicating the existence and scope of R.S. 2477 rights-of-way is a court of

appropriate jurisdiction in the state in which the road is located.  *Leo Titus, Sr.*, *supra* at 337, 92

I.D. at 586-87.  However, an exception has been recognized where a determination by BLM is

necessary to facilitate proper administration of the public lands."); *Leo Titus, Sr.*, 89 IBLA 323,

337-38 (1985); *see generally Bear River Dev. Corp.*, 157 IBLA 37 (2002).  And the Counties

asserted the soundness of that view before the court of appeals as recently as the *SUWA* case.[14]

The Counties complain that the transportation and access sections of the Management

Plan leave all of their unresolved R.S. 2477 right-of-way claims in status quo—that is,

*unresolved*.  Yet maintaining the status quo as to unresolved claims, without more, cannot cause

---

[14]Indeed, in *SUWA*, the Counties argued that the BLM cannot make valid administrative determinations of R.S. 2477 right-of-way claims because the agency has no formal procedure in place for making them.  (Substitute Opening Brief of Appellants Kane and Garfield Counties, filed July 2, 2004, in *Southern Utah Wilderness Alliance v. Bureau of Land Management*, Case No. 04-4073, at 20-26; Reply Brief of Appellants Kane and Garfield Counties, filed Sept. 17, 2004, in *Southern Utah Wilderness Alliance v. Bureau of Land Management*, Case No. 04-4073, at 18-23.)

the Counties a discrete injury-in-fact sufficient to afford them standing to challenge the validity

of the Management Plan under the APA.

A road closure affecting a specific route claimed to be an R.S. 2477 right-of-way invites a

protest, an administrative appeal, or the commencement of a civil action, as the cases cited by the

Counties suggest.  In *SUWA*, the court of appeals reminded the Counties that "the burden of

proof lies on those parties 'seeking to enforce rights-of-way against the federal government.'"

425 F.3d at 768 (quoting *Southern Utah Wilderness Alliance v. Bureau of Land Management*,

147 F. Supp. 2d 1130, 1136 (D. Utah 2001)).

> This allocation of the burden of proof to the R.S. 2477 claimant is
> consonant with federal law and federal interests. As the district court noted,
> "[T]he established rule [is] that land grants are construed favorably to the
> Government, that nothing passes except what is conveyed in clear language, and
> that if there are doubts they are resolved for the Government, not against it." 147
> F. Supp.2d at 1136 (quoting *Watt v. Western Nuclear, Inc.*, 462 U.S. 36, 59, 103
> S.Ct. 2218, 76 L.Ed.2d 400 (1983), in turn quoting *United States v. Union Pac.
> R.R. Co.*, 353 U.S. 112, 116, 77 S.Ct. 685, 1 L.Ed.2d 693 (1957)) (brackets in
> district court opinion). Other courts have applied this rule to R.S. 2477 cases,
> *Adams v. United States*, 3 F.3d 1254, 1258 (9th Cir. 1993); *United States v.
> Balliet*, 133 F. Supp.2d 1120, 1129 (W.D.Ark. 2001); *Fitzgerald v. United States*,
> 932 F.Supp. 1195, 1201 (D.Ariz. 1996), and we agree. . . .

*Id.* at 769.  It is for the Counties as R.S. 2477 claimants to step forward and pursue their

unresolved R.S. 2477 claims in a proper forum, demonstrating the historical existence of rights-

of-way that they now assert to exist.[15]  In the meantime, the Counties' assertion of R.S. 2477

claims by itself cannot forestall the BLM implementation of the travel route system formulated

---

[15]The *SUWA* court noted that "[t]he burden may be different in cases where the R.S. 2477 claim has previously been adjudicated, or where there is a federal disclaimer of interest, memorandum of understanding, or other administrative recognition. We have no occasion in this case to opine on the legal effect of such administrative determinations."  425 F.3d at 769 n.20.  In this case, the Counties' acknowledged R.S. 2477 rights-of-way, *e.g.*, the Burr Trail, are depicted as roads on Map 2 of the Management Plan, while the Counties' unresolved R.S. 2477 rights-of-way purportedly are not.

through its internal planning process.  *See Charles W. Nolen*, 168 IBLA 352, 2006 WL 1644644

(2006); *Rainer Huck*, 168 IBLA 365, 2006 WL 1644645 (2006) ("BLM did not need to decide

the validity of the R.S. 2477 assertions in order to make its route designations, especially since it

did not intend its analysis to affect any R.S. 2477 validity determinations and indicated that the

Plan would be adjusted to reflect any R.S. 2477 decisions.")

The Counties express concern about performing maintenance and construction work on

their claimed R.S. 2477 rights-of-way in potential conflict with the terms of the Management

Plan.  The Management Plan contemplates maintenance work on roads designated as "open"

within the Monument.[16]  Should the Counties wish to perform work beyond simple maintenance

on its claimed R.S. 2477 rights-of-way, the court of appeals outlined the preferred approach:

> [W]hen the holder of an R.S. 2477 right of way across federal land proposes to
> undertake any improvements in the road along its right of way, beyond mere
> maintenance, it must advise the federal land management agency of that work in
> advance, affording the agency a fair opportunity to carry out its own duties to

---

[16]The maintenance provision of the Plan reads:

**Maintenance**

TRAN-7 With the exception of those segments listed below, open routes may be maintained within the disturbed travel surface area as of the date of this Plan; no widening, passing lanes, or other travel surface upgrades could occur.  Deviations from the current maintenance levels will be allowed as follows (subject to Wilderness Study Area Interim Management Policy, BLM Manual H-3550-1):

   • Hole-in-the-Rock Road: Allow stabilization of washout prone areas, primarily along the southeastern end, to prevent erosion and sediment loading in drainages.

   • Smoky Mountain Road: Allow stabilization in the Alvey Wash section to prevent erosion and sediment loading in drainages.

   • Cottonwood Wash Road: Allow stabilization of washout prone areas, primarily along the southern section, to prevent erosion and sediment loading in drainages.

   • Skutumpah Road: Allow new crossing for safety at Bull Valley Gorge, and stabilization of washout prone areas, primarily along the northern section, to prevent erosion and sediment loading in drainages.

(*Grand Staircase-Escalante National Monument Approved Management Plan/Record of Decision*, ch. 2, at 47.)

> determine whether the proposed improvement is reasonable and necessary in light of the traditional uses of the rights of way as of October 21, 1976, to study potential effects, and if appropriate, to formulate alternatives that serve to protect the lands.  The initial determination of whether the construction work falls within the scope of an established right of way is to be made by the federal land management agency, which has an obligation to render its decision in a timely and expeditious manner. The agency may not use its authority, either by delay or by unreasonable disapproval, to impair the rights of the holder of the R.S. 2477 right of way. In the event of disagreement, the parties may resort to the courts.

*SUWA*, 425 F.3d at 748 (footnotes omitted).  The Tenth Circuit's prescription as to how to proceed, in turn, is buttressed by Utah law: in 1993, the Utah Legislature enacted the Rights-of-Way Across Federal Lands Act, Utah Code Ann. § 72-5-303, which provides that "[t]he owner of an R.S. 2477 right-of-way and the owner of the servient estate shall exercise their rights without unreasonably interfering with one another."  *Id.* at § 72-5-303(2).  If there is genuine doubt concerning a particular road, the same approach could be taken as to maintenance work as well.

The Counties may not shift their burden as R.S. 2477 claimants or shortcut the existing processes for determining their unresolved R.S. 2477 claims by insisting that the BLM import its preliminary road inventory work on unresolved R.S. 2477 claims in 1991 and 1993 into its planning process in formulating the 1999 Management Plan.  To say that it was arbitrary, capricious or an abuse of discretion for the BLM *not* to do so would be to bind the agency in 1999 to preliminary administrative R.S. 2477 determinations made in 1991 and 1993—and never finalized—determinations that by definition cannot be binding on the courts or the parties.

The Counties suffered no discrete injury-in-fact to their legally protected interests flowing from the fact that the BLM did not incorporate its earlier road inventory work into the

-23-

Management Plan in 1999—at least in the fashion that the Counties would have preferred.[17]

Therefore, they lack standing to challenge the Management Plan on that basis, and the

defendants' motions should be granted at least to that extent.

**"Injury-in-Fact" and BLM Restrictions on Off-Highway Vehicles**

The Counties' allegation that the Management Plan's restriction on the use of off-

highway vehicles on roads within the Monument infringes on the Counties' right to regulate their

own R.S. 2477 rights-of-way asserts an injury-in-fact to their legally protected interests in those

rights-of-way.  But the defendants correctly point out that the "legally protected interests" in

question are *property* rights ostensibly vested in the Counties by operation of the statute, and

disputes concerning property rights on federal land must be brought into federal court pursuant to

the Quiet Title Act, 28 U.S.C.A. § 2409a (2006), not the Administrative Procedure Act. *See*

*Block v. North Dakota*, 461 U.S. 273, 284-85 (1983); *Southwest Four Wheel Drive Ass'n v.*

*Bureau of Land Management*, 363 F.3d 1069, 1071 (10th Cir. 2004); *Rosette, Inc. v. United*

*States*, 141 F.3d 1394, 1395-97 (10th Cir. 1998).  This is no less true where a plaintiff alleges

that the existence of an R.S. 2477 right-of-way invalidates an agency's decision to close or limit

the use of a road.  *See Southwest Four Wheel Drive Ass'n v. Bureau of Land Management*, 271 F.

Supp. 2d 1308, 1310-11 (D. N.M. 2003), *aff'd*, 363 F.3d 1069, 1071 (10th Cir. 2004); *cf.*

*Shawnee Trail Conservancy v. United States Dept. of Agriculture*, 222 F.3d 383, 386 (7th Cir.

2000), *cert. denied*, 531 U.S. 1074 (2001).

---

[17]The Counties' assertion that the BLM's preliminary road inventory work in 1991 and 1993 indicated "that approximately 75% to 85% of the Garfield and Kane County rights-of-way would be administratively determined to be R.S. 2477 rights-of-way" is grounded upon the Declaration of Brian B. Bremner, but is plainly hearsay.  (*See* Declaration of Brian B. Bremner, filed June 16, 2006 (dkt. no. 31), at 4-5 ¶ 12 (Through my work with BLM staff, I learned that . . . .").)

The Counties' allegations concerning injury-in-fact to their "valid existing rights" resulting from the Management Plan's OHV restrictions necessarily implicate questions of title, *viz.*, the existence and historical scope of the Counties' claimed R.S. 2477 rights-of-way within the Monument's boundaries.  The Counties have not pleaded their existing OHV claims under the Quiet Title Act, and to that extent, they must be dismissed for want of jurisdiction.

**"Injury-in-Fact" and Failure to Coordinate with Local Governments**

As pleaded, the alleged injury-in-fact flowing from the BLM's alleged failure to coordinate the formulation of the Management Plan with county officials and existing county plans appears to be indistinguishable from that alleged with respect to the Plan's restriction of off-highway vehicles or the status of the Counties' unresolved R.S. 2477 claims within the Monument.   (*See* First Amd. Cmplt. at 19-21 ¶¶ 57-68.)  These allegations thus cannot confer standing upon the Counties or jurisdiction upon this court where the same has already been found to be lacking.

The Management Plan itself envisions coordination as a process that continues through implementation of the Plan:

> **Relationship to Other Agency Plans**
>
> Local, State, other Federal agencies, and Indian tribes in the immediate region routinely prepare plans that establish goals and direction for land use, economic development, or resource management within their jurisdictions. Many of these plans bear directly on or are significantly affected by BLM plans for managing public lands. Under this Plan, BLM will collaborate with such agencies and tribes on planning implementation and achieving consistency with other approved plans to the extent that they are determined consistent with federal laws, regulations, and policies. The principles of community-based planning will be employed where timing, mutual interest, and the availability of resources are appropriate to address economic, ecologic, and land use issues of concern. The following list of plans relates to the management of lands in or around the Monument and will be

given consideration as implementation proceeds.

> • Bryce Canyon National Park General Management Plan
> • Capitol Reef National Park General Management Plan
> • Glen Canyon National Recreation Area General Management Plan
> • Dixie National Forest Land and Resource Management Plan
> • Garfield County General Plan
> • Kane County General Plan
> • Kane County Water Conservancy Master Plan

(*Grand Staircase-Escalante National Monument Approved Management Plan/Record of Decision*, ch. 3, at 74.)  This suggests that the Counties' "lack of coordination" claim may fail for lack of ripeness as well.

**Ripeness & the District's Water Diversion Claim**

Besides the R.S. 2477 right-of-way and OHV travel restriction issues, the Counties challenge portions of the Management Plan that deal with the diversion of water within the Monument's boundaries, stating that "[i]n general, proposals for diverting water out of the Monument will not be permitted.  Exceptions could be made as discussed previously in WAT-[1] of the Water section of this chapter."  (*Grand Staircase-Escalante National Monument Approved Management Plan/Record of Decision*, ch. 2, at 49 ¶ LAND-4.)   The Plan's water section elaborates on the point:

> In general, diversions of water out of the Monument will not be permitted. There is an existing small-scale diversion of groundwater out of the Monument for the domestic water supply of the nearby town of Henrieville. This Plan does not prohibit the continuation of this diversion, nor its expansion, if necessary, to meet the municipal needs of population growth in Henrieville.  Any proposed new groundwater diversion to meet Henrieville's municipal needs could be approved, consistent with the Plan, if the BLM and the Utah State Engineer complete a joint analysis to determine that such development would not adversely impact springs or other water resources within the Monument, and the BLM completes the usual NEPA analysis.  Exceptions could be considered for other local community culinary needs if the applicant could demonstrate that the diversion of water will

> not damage water resources within the Monument or conflict with the objectives
> of this Plan.

(*Id.* at 32 ¶ WAT-1. ) "Water may not be diverted out of the Monument," the Plan reiterates,

"except as described . . . for the town of Henrieville or for other local communities if the

applicant demonstrates no effect on Monument resources."  (*Id.*, App. 2, at 85.)

The Counties submit that the Plan "places an unauthorized burden on the removal of

water from the Monument.  In fact, as written, the Plan would prohibit diversion of water for

commercial or agricultural use," and "is arbitrary and capricious on its face." (Counties' Mem. at

20.)  The Declaration of Michael Noel, filed June 16, 2006 (dkt. no. 33), avers that in May of

2006, the Kane County Water Conservancy District "submitted an application for a Title V right-

of-way to drill a 12-inch well and to construct an access road, pipeline and electircal service line

to convey water from the well to the District's Johnson Canyon Water system."  (*Id.* at 5 ¶ 10.)

While the Noel Declaration refers to "[t]he BLM's apparent decision not to let the District divert

its water," (*id.* at 6 ¶ 13), the BLM had not formally granted or denied the District's application

as of the time of the January 22, 2007 hearing.  Since the hearing, the parties have given no

indication that the BLM has acted upon the District's right-of-way application, either to grant it

or deny it.

The Counties seek injunctive relief against enforcement or implementation of the

"unauthorized water diversion provisions of the Plan," (First Amd. Cmplt. at 27 ¶3), but they

have not pleaded an actual injury-in-fact resulting from the challenged provisions.  While the

District's right-of-way application remains pending—at least for a reasonable period of

time—the claim that the water diversion provisions of the Management Plan operate to deny the

District's right to use water pursuant to applications pending before the Utah State Engineer appears to be premature.  Absent well-pleaded allegations of either the BLM's denial of the District's application, or of a concerted refusal to act on the part of the agency that amounts to a denial of that application, this claim is not yet ripe for adjudication in this proceeding.

      For all of the foregoing reasons,

      **IT IS ORDERED** that the Federal Defendants' Motion to Dismiss (dkt. no. 17) is GRANTED IN PART, and (1) the plaintiffs' action for judicial review of the Grand Staircase-Escalante National Monument Approved Management Plan/Record of Decision pursuant to the Administrative Procedure Act, 5 U.S.C.A. §§ 701 *et seq.* (2007) as pleaded in the First Amended Complaint (dkt. no. 9) is DISMISSED for lack of standing to sue concerning (*i*) the agency's promulgation of the transportation and access provisions of the Management Plan without first determining the Counties' unresolved R.S. 2477 right-of-way claims and (*ii*) the agency's alleged failure to coordinate the provisions of the Management Plan with local government officials and existing plans; (2) the plaintiffs' claim that the travel and access portions of the Management Plan—and in particular the restriction of the use of off-highway vehicles on roads within the Monument—interfere with their exercise of valid existing rights on R.S. 2477 rights-of-way is DISMISSED for lack of subject matter jurisdiction, and the plaintiffs are hereby granted leave to file an amended complaint under the Quiet Title Act as to the existence and scope of R.S. 2477 rights-of-way within twenty (20) days of the entry of this Memorandum Opinion & Order; and (3) the Kane County Water Conservancy District's claim concerning the diversion of water out of the Monument is DISMISSED as premature, and the District is hereby granted leave to file an amended complaint  within twenty (20) days of the entry of this Memorandum Opinion & Order;

and

**IT IS FURTHER ORDERED** that the Intervenor-Defendants' Motion for Judgment on the Pleadings (dkt. no. 23) is GRANTED IN PART to the extent and for the same reasons as the Federal Defendants' motion to dismiss.


DATED this _____ day of June, 2007.


BY THE COURT:


_____
Bruce S. Jenkins
United States Senior District Judge

and

**IT IS FURTHER ORDERED** that the Intervenor-Defendants' Motion for Judgment on the Pleadings (dkt. no. 23) is GRANTED IN PART to the extent and for the same reasons as the Federal Defendants' motion to dismiss.

DATED this **29** day of June, 2007.

BY THE COURT:

Bruce S. Jenkins
United States Senior District Judge